**IN THE COURT OF APPEALS OF IOWA**

No. 24-1485
Filed November 13, 2024

**IN THE INTEREST OF K.J.,**
**Minor Child,**

**J.W., f/k/a K.T.,**
        Appellant.

_____

        Appeal from the Iowa District Court for Black Hawk County, Daniel L. Block,

Judge.

        A parent appeals the termination of his parental rights to his child.

**AFFIRMED.**

        Jamie L. Schroeder of Nelson & Toenjes PLLC, Shell Rock, for appellant.

        Brenna Bird, Attorney General, and Mackenzie Moran, Assistant Attorney

General, for appellee State.

        Kelly J. Smith of Waterloo Juvenile Public Defender's Office, Waterloo,

attorney and guardian ad litem for minor child.

        Considered by Schumacher, P.J., and Badding and Chicchelly, JJ.

**CHICCHELLY, Judge.**

J.W.[1] appeals the termination of his parental rights to K.J.,[2] contending a six-month extension should have been granted. Upon our review, we affirm.

## I.    *Background Facts and Proceedings.*

The Iowa Department of Health and Human Services first became involved with the family based on allegations of "extreme physical abuse, neglect, [and] denial of critical care." The report that initiated the department's investigation alleged that J.W. had hit then-seven-year-old K.J., causing a black eye and visible bruising on her face and body. J.W. later confirmed that he caused the child's injuries. He also admitted that he hit the two younger children he shared with K.J.'s stepfather, regularly called K.J. "no good" and "piece of shit," regularly threatened to kill K.J., and engaged in domestic violence in front of the children. The State charged J.W. with one count of child endangerment causing bodily injury, a class "D" felony in violation of Iowa Code section 726.6(7) (2023), for the injuries inflicted on K.J.; it also charged J.W. with two counts of child endangerment, aggravated misdemeanors in violation of Iowa Code section 726.6(8), for those inflicted on the two younger children.

---

[1] J.W. is K.J.'s biological mother and uses he/him/his pronouns. To distinguish him from the biological father and stepfather, we refer to him by his initials or the term "parent."

[2] The juvenile court also terminated the biological father's parental rights to K.J. Before K.J. was born, the biological father suffered from a brain injury, which rendered him unable to care for himself. At the time of the termination, he lived in a 24/7 care facility and had never had a relationship with K.J. K.J. receives social security benefits due to his disability. His guardian was provided notice of the termination proceedings. Because he does not appeal, we do not address him any further on appeal.

Before the department's involvement, K.J. showed up to a therapy appointment with visible bruising and reported to her therapist that J.W. was withholding food "because she was being naughty." Her therapist reported the abuse and expressed her concerns to J.W., who "stated in front of [K.J.] that he did not love or want [her] and the only reason he keeps [K.J.] is because he needs [her] disability money to pay his car payment." J.W. also admitted to the therapist that "he was upping his abuse to get [K.J.] taken away." In June 2023, the juvenile court granted his wish, and all three children were removed from the home. The court later jointly adjudicated them as Children In Need of Assistance.[3]

Throughout the next year of proceedings, J.W. did not comply with the department's recommendations. Despite having a history of unaddressed mental-health concerns and reporting multiple diagnoses, J.W. refused to seek treatment and admitted he did not take his prescribed medications, although he later claimed he was compliant. J.W. told the department he did not need counseling or anger management because "all the issues were [K.J.'s] problems" and "if [K.J.] would listen then the problems would be solved." J.W. consistently blamed K.J. for the removal, stating her behaviors "caused me to beat her." While J.W. claimed that K.J. had "extreme" behaviors requiring regular physical discipline, the department never witnessed this. Instead, providers described K.J.

---

[3] While the children were removed and adjudicated together, their termination proceedings were held separately. In August 2024, the juvenile court terminated J.W.'s and the stepfather's parental rights to the two younger children. We affirmed on appeal. *See In re Z.W.*, No. 24-1004, 2024 WL 4223398, at *2 (Iowa Ct. App. Sept. 18, 2024). While we do not address them as part of this appeal, the court took judicial notice of the underlying CINA proceedings, which we do consider.

as a "polite, well behaved little girl." While K.J. had the occasional "manageable" tantrum, the department indicated this was typical for children, especially those suffering from trauma. K.J. was even discharged from behavioral health intervention services (BHIS) after she met her behavioral goals and because J.W. "was not willing to take any suggestions that were offered." No other BHIS worker was willing to take the case based on the family's history of treating providers poorly.

The department was similarly concerned about J.W. and the stepfather's tumultuous relationship. The couple admitted to prior incidents of domestic violence, both in the presence of the children and alone, which J.W. attributed to stress from finances. Even with the stepfather's sizable salary compared to the family's relative lack of expenses, J.W. claimed the family was already not meeting their basic needs without K.J.'s social security check. The department offered to help with budgeting or securing employment, but J.W. refused services. He also expressed a desire to end the marriage, but he maintained that finances prevented him from leaving. The department provided J.W. with housing resources and a list of employers willing to hire individuals with a criminal history. But J.W. refused to work at any of the locations because he would not work for less than "$20 or $25 an hour."

In late November 2023, J.W. emailed the department alleging the stepfather had been sexually abusing K.J., which sparked another child abuse assessment. Through this investigation, J.W. admitted he allowed then-four or five-year-old K.J. to touch the stepfather's penis, stating that it was "ok" because "[K.J.] was curious and [he] didn't want to upset [the stepfather] by saying no." Both J.W. and the

stepfather also confessed to engaging in sexual activities, including oral sex and fondling, in front of K.J. In January 2024, the State charged J.W. and the stepfather with second-degree sexual abuse, a class "B" felony, in violation of Iowa Code section 709.3(1)(b). A no-contact order was issued, which suspended visitation between J.W. and K.J.

During the summer of 2024, J.W. did not engage in any services, and the State petitioned for termination of his parental rights. Just days before the August termination hearing, the department learned that J.W. had bonded out of jail back in July. But by the time of the termination hearing, he still had not contacted the department to re-engage services. When the court questioned this, J.W. claimed he was trying to find housing and employment, and he requested more time to work towards reunification. J.W. further promised he would reach out to the department "to try to start up" services again. The juvenile court declined J.W.'s request for additional time and terminated his parental rights to K.J. J.W. appeals.

## II. Review.

Our review of termination-of-parental-rights proceedings is de novo. *In re A.M.*, 843 N.W.2d 100, 110 (Iowa 2014). "We are not bound by the juvenile court's findings of fact, but we do give them weight, especially in assessing the credibility of witnesses." *Id.* (citation omitted).

## III. Discussion.

J.W. does not contest the statutory grounds for termination or that termination was not in K.J.'s best interests; we therefore do not address these issues. *See In re K.W.*, No. 23-1884, 2024 WL 1757377, at *2 (Iowa Ct. App. Apr. 24, 2024) ("limit[ing] our review to the specific claims presented"). Instead,

he argues only that a six-month extension should have been granted. *See* Iowa Code § 232.104(2)(b) (permitting the court to grant a parent more time to work towards reunification if "the need for removal of the child from the child's home will no longer exist at the end of the additional six-month period"). To justify additional time, the court must be able to "enumerate the specific factors, conditions, or expected behavioral changes" that will occur over the additional six months. *Id.* To put it another way, we do not provide additional time in excess of what is prescribed by the legislature without sufficient reason. *See In re C.B.*, 611 N.W.2d 489, 494 (Iowa 2000); *In re D.W.*, 791 N.W.2d 703, 707 (Iowa 2010) ("We do not gamble with the child['s] future by asking them to continuously wait for a stable biological parent." (cleaned up); *In re J.P.*, 499 N.W.2d 334, 339 (Iowa Ct. App. 1993) (finding the purpose of termination statutes is "to prevent children from being perpetually kept in foster care" awaiting permanency). Upon our review, we do not find that J.W. proved sufficient reason justifies the additional time. *See In re W.T.*, 967 N.W.2d 315, 323 (Iowa 2021) (placing the burden on the parent to "show the impediments to placing [the child] with him will not exist in six months").

J.W. has not provided any indication that he would be able to care for K.J. after the six months have elapsed. *See C.B.*, 611 N.W.2d at 495 (considering a parent's "past performance" to indicate "the quality of the future care that parent is capable of providing"). In fact, he made no progress at all. J.W. is awaiting "trial on a pending class 'B' felony with a seventeen-and-a-half-year mandatory minimum and a class 'D' felony carrying a five-year prison sentence with no minimum." *Z.W.*, 2024 WL 4223398, at *2. Even ignoring the pending criminal charges, J.W. refused to engage in services throughout the life of the case and

had not had a visit with K.J. in nearly eight months. Only now, after his rights have been terminated, does he "express an interest in parenting." *See C.B.*, 611 N.W.2d at 495. This is far too late. *See id.* J.W. did not even take the most basic first step towards reunification: to take accountability for the abuse he perpetrated on K.J. *See In re S.R.*, 600 N.W.2d 63, 65 (Iowa Ct. App. 1999) ("The requirement that a parent acknowledge and recognize abuse is essential for any meaningful change to occur."); *In re D.D.*, 955 N.W.2d 186, 195 (Iowa 2021) (Christensen, C.J., concurring specially) ("A parent's failure to address his or her role in the abuse may hurt the parents' chances of regaining custody and care of their children." (citation omitted)). Instead, J.W. consistently placed all the blame on the victim. As the court noted, K.J. "has been through . . . more than any child at eight years old should have to go through." J.W. has not addressed or even acknowledged any of the issues that led to K.J.'s removal.

Further, after over a year of uncertainty, K.J. deserves permanency, which her foster placement is willing to provide. *See D.W.*, 791 N.W.2d at 708 (finding the child's bond with pre-adoptive foster placement favors terminating parental rights). K.J.'s foster mother testified that K.J. has been thriving in their care, "has asked us to adopt her," and that "we absolutely would love to." The department confirmed K.J.'s progress, stating she recently began to "open up about the sexual abuse" in therapy "because she's now starting to feel safe." We do not "deprive a child of permanency . . . by hoping someday a parent will learn to be a parent and be able to provide a stable home for the child." *A.M.*, 843 N.W.2d at 112 (citation omitted). J.W. has not shown he will provide such a home. At the termination hearing, the court expressed this perfectly:

> But to me, if you were genuine, if you were sincere, if you really wanted to have [K.J.] back in your care, the day you got out of jail, the first place you would have stopped is [the department's] office, and you didn't. In fact, you [still] haven't. And you know, [K.J.] waits, waits, waits, waits. . . . She needs to know where she's going to be. She needs to stop waiting. She needs to stop wondering. She needs to start being an eight-year-old kid.

J.W. cannot even acknowledge the seriousness of his own actions and has made no progress in making changes. Accordingly, we affirm the court's denial of his request for more time.

### IV. Disposition.

Because the need for removal will still exist after six months, we decline to grant an extension and affirm termination of J.W.'s parental rights to K.J.

**AFFIRMED.**